Department of Justice
Office of Public Affairs

FOR IMMEDIATE RELEASE
Thursday, December 21, 2017

## JUSTICE DEPARTMENT RECOVERS OVER $3.7 BILLION FROM FALSE CLAIMS ACT CASES IN FISCAL YEAR 2017

The Department of Justice obtained more than $3.7 billion in settlements and judgments from civil cases involving fraud and false claims against the government in the fiscal year ending Sept. 30, 2017, Acting Assistant Attorney General Chad A. Readler of the Justice Department's Civil Division announced today. Recoveries since 1986, when Congress substantially strengthened the civil False Claims Act, now total more than $56 billion.

"Every day, dedicated attorneys, investigators, analysts, and support staff at every level of the Justice Department are working to root out fraud and hold accountable those who violate the law and exploit critical government programs," said Acting Assistant Attorney General Chad A. Readler of the Justice Department's Civil Division. "The recoveries announced today are a testament to the efforts of these valuable public servants and a message to those who do business with the government that fraud and dishonesty will not be tolerated."

Of the $3.7 billion in settlements and judgments, $2.4 billion involved the health care industry, including drug companies, hospitals, pharmacies, laboratories, and physicians. This is the eighth consecutive year that the department's civil health care fraud settlements and judgments have exceeded $2 billion. The recoveries included in the $2.4 billion reflect only federal losses. In many of these cases, the department was instrumental in recovering additional millions of dollars for state Medicaid programs.

In addition to combatting health care fraud, the False Claims Act serves as the government's primary civil remedy to redress false claims for government funds and property under government programs and contracts relating to such varied areas as defense and national security, food safety and inspection, federally insured loans and mortgages, highway funds, small business contracts, agricultural subsidies, disaster assistance, and import tariffs.

**Health Care Fraud**

The department investigates and resolves matters involving a wide array of health care providers, goods and services. The department's health care fraud recoveries restore valuable assets to federally funded programs, such as Medicare, Medicaid, and TRICARE. But just as important, the department's vigorous pursuit of health care fraud prevents billions more in losses by deterring others who might otherwise try to cheat the system for their own gain.

The largest recoveries involving the health care industry this past year – over $900 million – came from the drug and medical device industry.  Shire Pharmaceuticals LLC paid $350 million to resolve allegations that Shire and the company it acquired in 2011, Advanced BioHealing (ABH), induced clinics and physicians to use or overuse its bioengineered human skin substitute by offering lavish dinners, drinks, entertainment and travel; medical equipment and supplies; unwarranted payments for purported speaking engagements and bogus case studies; and cash, credits and rebates.  In addition to these kickback allegations, the settlement also resolved allegations brought by relators that Shire and ABH unlawfully marketed the skin substitute for uses not approved by the FDA, made false statements to inflate the price of the product, and caused improper coding, verification, or certification of claims for the product and related services.  The settlement included $343.9 million in federal recoveries, and another $6.1 million in recoveries to state Medicaid programs.

In another important case, drug manufacturer Mylan Inc. paid approximately $465 million to resolve allegations that it underpaid rebates owed under the Medicaid Drug Rebate Program by erroneously classifying its patented, brand name drug EpiPen – which has no therapeutic equivalents or generic competition – as a generic drug to avoid its obligation to pay higher rebates.  Between 2010 and 2016, Mylan increased the price of EpiPen by approximately 400 percent yet paid only a fixed 13 percent rebate to Medicaid during the same period based on EpiPen's misclassification as a generic drug.  Mylan paid approximately $231.7 million to the federal government and $213.9 million to state Medicaid programs.

The department also reported substantial recoveries from other health care providers.  Life Care Centers of America Inc. and its owner agreed to pay $145 million to settle allegations that it caused skilled nursing facilities to submit false claims for rehabilitation therapy services that were not reasonable, necessary, or skilled.  This was the largest civil settlement with a skilled nursing facility chain in the history of the False Claims Act.  The government alleged that Life Care instituted corporate-wide policies and practices designed to place beneficiaries in the highest level of Medicare reimbursement – known as "Ultra High" – irrespective of the clinical needs of the patients, resulting in the provision of unreasonable and unnecessary therapy to many beneficiaries.  Life Care also allegedly sought to keep patients longer than necessary in order to continue billing for rehabilitation therapy.

In addition, eClinicalWorks (ECW) – a national electronic health records software vendor – and certain of its employees paid $155 million to resolve allegations that they falsely obtained certification for the company's electronic health records software by concealing from its certifying entity that its software did not comply with the requirements for certification.  For example, rather than programming all the required standardized drug codes into its software, the

company allegedly "hardcoded" into its software only the drug codes required for testing. As a result of the deficiencies in its software, ECW allegedly caused physicians who used its software to submit false claims for federal incentive payments. The United States also alleged that ECW paid unlawful kickbacks to certain customers in exchange for promoting its product.

"While we encourage voluntary reporting of suspected federal violations through self-disclosures, compliance guidance, and corporate integrity agreements, the False Claims Act holds accountable those health care organizations unwilling to comply with law," said Daniel R. Levinson, Inspector General of the U.S. Department of Health and Human Services. "Large health care recoveries benefit vulnerable Medicare and Medicaid beneficiaries as well as the taxpayers who support these programs."

**Housing and Mortgage Fraud**

The department reported settlements and judgments totaling over $543 million in the areas of housing and mortgage fraud this past fiscal year. In September 2017, a unanimous jury in Houston, Texas, found that Allied Home Mortgage Capital Corporation and Allied Home Mortgage Corporation violated the False Claims Act and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) and awarded the government over $296 million. The court also entered judgment for over $25 million against Allied's President and Chief Executive Officer (CEO). At trial, the government presented evidence that Allied falsely certified that thousands of high risk, low quality loans were eligible for Federal Housing Administration (FHA) insurance and then submitted insurance claims to FHA when any of those loans defaulted. The jury also heard evidence that, to evade oversight and disguise default rates, Allied Capital originated FHA-insured loans from more than one hundred "shadow" branch offices without the authorization of HUD. In addition, the jury received evidence that Allied's quality control department submitted falsified quality control reports to HUD auditors and falsely certified that Allied was in compliance with HUD quality control guidelines. Allied has appealed the judgment.

In addition to the judgment against Allied, the Department secured a settlement with PHH Mortgage for $65 million and Financial Freedom for $89 million. PHH Mortgage admitted that it had originated and endorsed residential mortgages as eligible for federal insurance by the FHA that did not meet underwriting requirements intended to reduce the risk of default. The government alleged that although internal reports identified high rates of underwriting deficiencies, PHH Mortgage failed to report such deficiencies to the authorities as required under the program to enable the agency to prevent continued program violations and mounting losses. By originating and endorsing ineligible loans for FHA insurance, PHH Mortgage allegedly put borrowers at risk of losing their homes, and increased its mortgage profits at taxpayer expense while incurring little or no risk of its own. The settlement with Financial

Freedom concerned the servicing of reverse mortgage loans, which allow older people to access equity in their homes. The United States alleged that Financial Freedom misrepresented its eligibility for certain insurance payments, thereby obtaining interest from FHA to which it was not entitled.

**Procurement Fraud**

In fiscal year 2017, the department aggressively pursued a variety of procurement fraud matters. For example, Agility Public Warehousing Co. KSC, a Kuwaiti company, as part of a global settlement, paid $95 million to resolve civil fraud claims and agreed to forgo administrative claims against the United States seeking $249 million in additional payments under its military food contracts, among other terms. In its civil complaint, the United States alleged that Agility knowingly overcharged the Department of Defense for locally available fresh fruits and vegetables supplied to U.S. soldiers in Kuwait and Iraq by failing to disclose and pass through discounts and rebates it obtained from suppliers, as required by its contracts.

The department resolved two cases involving the alleged failure to follow applicable nuclear quality standards. Bechtel National Inc., Bechtel Corp., URS Corp. (the predecessor in interest to AECOM Global II LLC) and URS Energy and Construction Inc. (now known as AECOM Energy and Construction Inc.) agreed to pay $125 million to resolve allegations that they charged the Department of Energy (DOE) for deficient nuclear quality materials, services, and testing, and improperly used federal contract funds to pay for a comprehensive, multi-year campaign to lobby Congress and other federal officials. Energy & Process Corporation (E&P) agreed to pay $4.6 million to resolve allegations that it knowingly failed to perform required quality assurance procedures and supplied defective steel reinforcing bars (rebar) in connection with a contract to construct a DOE nuclear waste treatment facility.

CA Inc. agreed to pay $45 million to resolve allegations that it made false statements and claims in the negotiation and administration of a General Services Administration (GSA) contract for software licenses and maintenance services. The settlement resolved allegations that CA provided false information to the GSA about the discounts it gave commercial customers for its software licenses and maintenance services during contract negotiations and failed to provide government customers with additional discounts when commercial discounts improved.

**Other Fraud Recoveries**

The number and variety of judgments and settlements announced during fiscal year 2017 illustrate the diversity of cases pursued by the department to root out fraud and false claims against the government wherever they may be found.

For example, SolarCity Corporation agreed to pay $29.5 million to resolve allegations that it submitted inflated claims to the U.S. Department of the Treasury pursuant to Section 1603 of the American Recovery and Reinvestment Act of 2009. Under the Section 1603 Program, the Treasury paid a cash grant to construct or acquire qualified renewable solar energy systems. The settlement resolved allegations that SolarCity falsely overstated the cost bases of its solar energy properties in claims for Section 1603 funds in order to receive inflated grant payments from the Treasury. As part of the settlement, SolarCity and its affiliates also released all pending and future claims against the United States for additional Section 1603 payments.

Total Call Mobile LLC agreed to pay $30 million to resolve allegations that it defrauded the Lifeline Program, a federal government subsidy program that offers discounted mobile phone services to eligible low-income consumers. Total Call and its co-defendants allegedly submitted false claims for federal payments by seeking reimbursement for tens of thousands of consumers who did not meet Lifeline Program eligibility requirements. As part of the settlement, Total Call entered into a separate administrative agreement with the Federal Communications Commission and agreed to no longer participate in the Lifeline Program.

ADS Inc. and its subsidiaries agreed to pay $16 million to settle allegations that they violated the False Claims Act by knowingly conspiring with and causing purported small businesses to submit false claims for payment in connection with fraudulently obtained small business contracts. The settlement also resolved allegations that ADS engaged in improper bid rigging relating to certain of the fraudulently obtained contracts. The settlement with ADS ranked as one of the largest recoveries involving alleged fraud in connection with small business contracting eligibility.

**Individual Accountability**

The department continued to ensure individual accountability for corporate wrongdoing by pursuing False Claims Act and other civil remedies to redress fraud by individuals as well as corporations.

In some cases, individual owners and executives of private corporations agreed to be held jointly and severally liable for settlement payments with their corporations. For example, Girish Navani, Rajesh Dharampuriya, and Mahesh Navani, three of the founders of eClinicalWorks, agreed to joint and several liability for the $155 million settlement discussed above. In addition, three other eClinicalWorks employees – developer Jagan Vaithilingam and project managers Bryan Sequeira, and Robert Lynes – entered into separate settlement agreements to resolve liability for their alleged personal involvement in the conduct. Forrest Preston, the owner of Life Care Centers of America, agreed to joint and several liability for the $145 million settlement discussed above, and Nicholas and Gregory Melehov, the owners of Medstar Ambulance Inc., agreed to be jointly and severally liable for a $12.7 million settlement with their company.

The department also obtained more than $60 million in settlements and judgments with individuals under the False Claims Act that did not involve joint and several liability with the corporate entity. For example, after 21st Century Oncology LLC paid $19.75 million to resolve allegations that it billed federal health care programs for medically unnecessary laboratory tests, the department secured separate settlements with various individual urologists, including a $3.8 million settlement with Dr. Meir Daller, resolving allegations that the physicians referred unnecessary tests to a laboratory owned and operated by 21st Century Oncology. Other examples include Dr. Robert Windsor, a pain management physician who agreed to the entry of a $20 million consent judgment to resolve allegations that he billed federal health care programs for surgical monitoring services that he did not perform and for medically unnecessary diagnostic tests; Dr. Gary L. Marder, a physician and the owner and operator of the Allergy, Dermatology & Skin Cancer Centers in Port St. Lucie and Okeechobee, Florida, who agreed to the entry of an $18 million consent judgment in connection with the performance of radiation therapy services; Joseph Bogdan, the owner of AMI Monitoring Inc. (also known as Spectocor), who agreed to pay $1 million to resolve liability for his alleged involvement in billing Medicare for higher and more expensive levels of cardiac monitoring services than requested by the ordering physicians; and Siddhartha Pagidipati, the former CEO of Freedom Health, who agreed to pay $750,000 to resolve liability for his alleged involvement in an illegal scheme to maximize payment from the Medicare Advantage program.

**Recoveries in Whistleblower Suits**

Of the $3.7 billion in settlements and judgments reported by the government in fiscal year 2017, $3.4 billion related to lawsuits filed under the qui tam provisions of the False Claims Act. During the same period, the government paid out $392 million to the individuals who exposed fraud and false claims by filing a qui tam complaint.

The number of lawsuits filed under the qui tam provisions of the Act has grown significantly since 1986, with 669 qui tam suits filed this past year – an average of more than 12 new cases every week.

"Because those who defraud the government often hide their misconduct from public view, whistleblowers are often essential to uncovering the truth," said Acting Assistant Attorney General Chad A. Readler of the Justice Department's Civil Division. "The Department's recoveries this past year continue to reflect the valuable role that private parties can play in the government's effort to combat false claims concerning government contracts and programs."

In 1986, Senator Charles Grassley and Representative Howard Berman led the successful efforts in Congress to amend the False Claims Act to, among other things, encourage whistleblowers to come forward with allegations of fraud. And in 2009, Senator Patrick J. Leahy, along with Senator Grassley and Representative Berman, championed the Fraud Enforcement and Recovery Act of 2009, which further strengthened the False Claims Act and its whistleblower provisions.

Mr. Readler also expressed his deep appreciation for the many dedicated public servants who investigated and pursued these cases throughout the Department's Civil Division and the U.S. Attorneys' Offices, as well as the agency Offices of Inspector General, and the many federal and state agencies that contributed to the Department's recoveries this past fiscal year.

"One of the honors of leading the Civil Division is the pleasure of working with the many passionate, dedicated, and talented Department of Justice employees," said Acting Assistant Attorney General Chad A. Readler of the Justice Department's Civil Division. "These individuals have committed their careers to serving the American people and defending the interests of our great nation. The accomplishments announced today are largely the result of their hard work and sacrifices."

The government's claims in the matters described above are allegations only; except where indicated, there has been no determination of liability. The numbers contained in this press release may differ slightly from the original press releases due to accrued interest.